UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY & Subsidiaries, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, General Electric Company ("GE"), on behalf of itself and its consolidated subsidiaries, hereby complains against the Defendant, the United States of America, as follows:

## NATURE OF ACTION

1.  This is an action arising under the Internal Revenue Code of 1986, as amended and codified in Title 26 of the United States Code ("IRC"), for a refund and recovery of federal income taxes of $439,332,365 and underpayment interest of $219,000,000 erroneously assessed by the Internal Revenue Service ("IRS") and paid in full by GE for the 2000 tax year, plus overpayment interest thereon as provided by law.

## PARTIES

2.  GE is a corporation organized and existing under the laws of the State of New York. GE maintains its executive offices at 3135 Easton Turnpike, Fairfield, Connecticut. GE's employer identification number is 14-0689340. GE is a diversified industrial and financial services corporation engaged in developing, manufacturing, and marketing a wide variety of products and services. GE is the common parent of an affiliated group as

      defined by IRC § 1504(a)(1) that filed consolidated federal income tax returns for all relevant years (the "<u>GE Consolidated Group</u>").

3. The Defendant is the United States of America.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2).

## FACTUAL BACKGROUND

6. At issue in this case are the tax consequences of GE's restructuring and sale of part of its former reinsurance business over a decade ago. In 2002, GE internally restructured part of its reinsurance business to respond to financial and regulatory issues confronting that business. This case is about the proper tax treatment of this internal restructuring and its effect on tax basis in the shares of one of GE's life reinsurance subsidiaries. This basis subsequently affected the amount of capital loss that the GE Consolidated Group realized when an interest in this subsidiary was sold in 2003. The Court's resolution of this issue will determine whether GE is entitled to the $2,196,661,823 capital loss that was disallowed by the IRS. What follows is an explanation of the financial and regulatory issues that led to the 2002 internal restructuring and the tax consequences of the internal restructuring.

### I. GE's Reinsurance Business in 2002

7. During the relevant period, GE's business included a large reinsurance business with operations both inside and outside the United States. GE sold most of this business between 2003 and 2006.

8. GE operated its reinsurance business through subsidiaries. Two of the reinsurance subsidiaries involved in the relevant transactions are Employers Reinsurance Corporation ("ERC") and ERC Life Reinsurance Corporation ("ERC Life").

9. ERC was the largest of GE's reinsurance companies with total assets of over $13 billion in 2002. ERC was an indirectly wholly-owned subsidiary of GE. ERC Life was a life reinsurance company and a wholly-owned subsidiary of ERC.

10. Although the majority of ERC Life's own operations consisted of the life reinsurance business, ERC Life indirectly owned European-based reinsurance companies, including several companies held primarily through holding companies, that were in the property and casualty reinsurance business rather than the life reinsurance business (together, these property and casualty companies and the holding companies are referred to herein as the "P&C Subsidiaries"). For U.S. tax purposes, the holding companies were considered to be part of ERC Life.

11. In 2002, ERC Life was not a member of the GE Consolidated Group.

12. Both ERC and ERC Life were insurance companies subject to regulation and examination by the Missouri Department of Insurance ("Missouri DOI").

13. As insurance companies, ERC's and ERC Life's statutory financial statements reflected their capital and surplus as determined under statutory accounting principles ("Regulatory Capital").

14. Among other things, Missouri DOI was responsible for examining and approving the extent to which ERC's and ERC Life's assets could be included in the computation of their Regulatory Capital.

15. In order to achieve and maintain strong insurance company ratings and therefore be attractive to current and prospective customers, ERC's business required Regulatory Capital well above amounts required by the Missouri DOI.

## II. Problems Facing GE's Reinsurance Business in 2002

16. By the time of the 2002 internal restructuring, GE's reinsurance business had experienced a period of poor financial performance due, in part, to the volatile nature of that business. This was among the reasons GE decided it should exit the reinsurance business.

17. GE's reinsurance business was facing three distinct, yet interrelated, issues at the end of 2002, as described below.

18. First, in late 2002, ERC was at risk that its Regulatory Capital would be reduced by over $1.4 billion because it would no longer be able to include in its Regulatory Capital the value of particular assets held by its subsidiary, ERC Life.

19. The assets in question were loans ERC Life had made over a number of years to the P&C Subsidiaries, which Missouri DOI indicated that it would no longer allow to be included in ERC Life's Regulatory Capital based on a concern that the P&C Subsidiaries lacked the liquid assets with which to repay the loans.

20. This was an issue for ERC even though the troubled assets were held by ERC Life because ERC Life's assets were included in ERC's Regulatory Capital by virtue of ERC's ownership of ERC Life. Therefore, a reduction in ERC Life's Regulatory Capital would result in a corresponding reduction to ERC's Regulatory Capital.

21. Second, in November 2002, GE determined that it was necessary to increase ERC's Regulatory Capital by an additional $1.8 billion by the end of 2002 to respond to increases to ERC's loss reserves in the fourth quarter of 2002. These increases in loss

reserves were established as a consequence of increases in estimates of future losses for various reinsurance claims, such as those related to product liability and asbestos.

22. Increasing ERC's Regulatory Capital by an additional $1.8 billion was important for several reasons, including ERC's insurance company rating and the value of ERC's business.

23. Third, after unsuccessful attempts to exit the entire reinsurance business, GE's management decided to focus on selling the life reinsurance business, of which ERC Life was a part. The life reinsurance business would be more attractive to potential purchasers if it did not include the P&C Subsidiaries, which were in the property and casualty reinsurance business.

### III.     The 2002 Internal Restructuring

24. To address the problems facing GE's reinsurance business in late 2002, GE internally restructured the reinsurance business in December 2002 by committing additional capital to that business, modifying its organizational structure, and reallocating assets among its subsidiaries as described below. The internal restructuring transaction was an integrated solution to the multiple problems facing the reinsurance business.

25. ERC Life sold the P&C Subsidiaries to a GE affiliate for their fair market value of $1.8 billion in cash. This transaction was treated as a direct sale from ERC Life to GE Investments, Inc. ("GEI") for U.S. tax purposes, even though the sale was to GEI's wholly-owned subsidiary OP Holdings, LLC. This is because OP Holdings was treated as a branch of GEI for U.S. tax purposes.

26. GEI, formed in 1984, was an established U.S. company in the GE corporate family. As of year-end 2001, GEI was a financially strong company with equity of $14.7 billion and net income of $962 million.

27. As a result of ERC Life's sale of the P&C Subsidiaries, the loans that concerned Missouri DOI were either no longer held by ERC Life or were paid off.

28. ERC Life distributed the $1.8 billion of sale proceeds to its parent ERC.

29. GE contributed $1.8 billion of cash to GEI in return for a new class of GEI Class C stock ("GEI Stock").  This GEI Stock provided for a 3-percent cumulative dividend and a liquidation preference equal to the greater of the net value of the P&C Subsidiaries or any unrecovered portion of the $1.8 billion issue price.

30. GE contributed the GEI Stock down the chain of ownership to ERC, which improved ERC's Regulatory Capital position in response to the needs identified above.

### IV.   Regulatory Review and Impact of 2002 Internal Restructuring

31. The 2002 internal restructuring was subject to the review of Missouri DOI.

32. Missouri insurance regulatory law provides the standards, rules and procedural requirements that enable Missouri DOI to review transactions between insurance companies and their affiliates.  Those rules require an insurance company (including a reinsurance company) to provide Missouri DOI with advance notification in writing for any material transaction between an insurance company and its affiliate.  The insurance company is prohibited from engaging in the transaction if Missouri DOI notifies the company that it disapproves of the transaction.

33. Missouri DOI reviewed and approved the sale of the P&C Subsidiaries to GEI and the $1.8 billion cash distribution from ERC Life to ERC.

34. Missouri DOI reviewed and determined that as of year-end 2002, ERC could include the GEI Stock at a value of $1.4 billion in its Regulatory Capital.

35. ERC's year-end statutory financial statements for 2002 reflected the improved Regulatory Capital position resulting from ERC Life's receipt of cash in exchange for the P&C Subsidiaries and ERC's receipt of GEI Stock.

36. This internal restructuring therefore addressed the complex and interrelated problems faced by GE's reinsurance business at the end of 2002. By removing the P&C Subsidiaries from ERC Life's ownership and by improving ERC's Regulatory Capital position with cash and the addition of GEI Stock, the internal restructuring addressed: (a) ERC's problem that Missouri DOI would no longer allow the $1.4 billion of loans to the P&C Subsidiaries to be included in Regulatory Capital, and (b) ERC's need for $1.8 billion of additional Regulatory Capital. In addition, removing the P&C Subsidiaries from ERC Life facilitated the ongoing efforts to sell the life reinsurance business.

## V.  Tax Consequences of the 2002 Internal Restructuring

37. The Internal Revenue Code requires that certain sales of a corporate subsidiary from one corporate affiliate to another corporate affiliate be treated as if the purchasing corporation paid a dividend to the selling corporation. *See* IRC §§ 301, 302, 304.

38. As required, ERC Life treated the sale of the P&C Subsidiaries in 2002 to GEI as the receipt of a dividend equal to the $1.8 billion sale proceeds. This dividend treatment increased ERC Life's earnings and profits ("E&P") by $1.8 billion for U.S. tax purposes. *See* IRC § 312.

39. The Internal Revenue Code required that ERC Life's $1.8 billion distribution out of its E&P to ERC also be treated as a dividend. *See* IRC §§ 301, 316. Because this distribution was a dividend, under the Internal Revenue Code it did not reduce ERC's basis in the stock of ERC Life that ERC later sold in 2003. *See* IRC § 301(c).

40. The deemed dividend paid by GEI to ERC Life and the dividend paid by ERC Life to ERC met the requirements for the dividends-received deduction under IRC § 243(a)(3).

41. Immediately prior to the $1.8 billion dividend ERC Life paid to ERC in the 2002 internal restructuring, ERC's basis in ERC Life was $2,682,622,615.

42. Immediately after the $1.8 billion dividend ERC Life paid to ERC in the 2002 internal restructuring, ERC's basis in ERC Life was $2,682,622,615.

## VI.  Capital Loss from 2003 Sale of ERC Life

43. In December 2003, ERC sold 95 percent of its stock in ERC Life to Scottish Holdings, Inc. ("Scottish Re") for $151,148,000. Scottish Re was unrelated to GE and its affiliates.

44. The sale to Scottish Re was a closed and completed transaction with an unrelated party resulting in the recognition of a loss under IRC § 165 with the amount of loss determined under IRC § 1001.

45. Due to other events that adjusted the basis, at the time of the sale ERC's adjusted tax basis in the ERC Life stock that it sold was $2,343,536,631.

46. As a result of the sale, ERC recognized a capital loss in 2003 of $2,196,661,823, calculated under IRC § 1001 as the difference between the sales price ($151,148,000) and the sum of ERC's basis in the ERC Life stock ($2,343,536,631) and selling expenses ($4,273,192).

47. GE implemented the 2002 internal restructuring of its reinsurance business and the 2003 sale of ERC Life to address multiple financial and regulatory issues facing the business at that time. GE properly reported the tax consequences of these transactions in accordance with the Internal Revenue Code and the regulations thereunder.

**PROCEDURAL BACKGROUND**

48. The erroneous assessment and overpayment of tax for GE's 2000 tax year arises from the disallowance of a capital loss carryback from GE's 2003 tax year totaling $2,196,661,823 ("Disputed Capital Loss").

49. The capital loss incurred on ERC's sale of ERC Life stock was claimed on GE's timely filed 2003 consolidated federal income tax return (IRS Form 1120). Pursuant to IRC § 1212, that loss was carried back to GE's timely filed consolidated tax return for 2000 and offset capital gains originally reported on that return. This resulted in a tentative refund that was paid by the IRS in full to GE in 2004.

50. The Disputed Capital Loss represents the correct amount of capital loss that should be allowed after GE adjusted the loss computation following the filing of its 2003 consolidated federal income tax return. GE notified the IRS of these computational adjustments in a Qualified Amended Return and a subsequent voluntary adjustment during the IRS audit of GE's 2003 tax return.

51. At the conclusion of its examination, the IRS erroneously disallowed the Disputed Capital Loss that arose from the sale of the ERC Life stock to Scottish Re and erroneously reversed the allowance of the tentative refund that was paid to GE in 2004.

52. The IRS's disallowance of the Disputed Capital Loss is erroneous. The internal restructuring was completed to address multiple pressing business concerns, and the resulting tax loss stems from the required application of the Internal Revenue Code provisions cited herein.

53. As a result of this erroneous disallowance, the IRS erroneously assessed taxes and interest for GE's 2000 tax year relating to the carryback of the Disputed Capital Loss.

54. GE owed additional taxes and interest as a result of this erroneous assessment.

55. On April 9, 2010, GE made a payment to the IRS of $666,929,909.99, which satisfied in full the amount assessed for the 2000 tax year. This amount included the $658,332,365 in tax and interest that was assessed with respect to the Disputed Capital Loss, plus other items unrelated to this claim.

56. On April 28, 2011, GE timely filed a claim for refund with the IRS for the 2000 tax year relating to the tax and underpayment interest it paid with respect to the Disputed Capital Loss, plus appropriate overpayment interest on the amount to be refunded. The claim sought a refund of $658,332,365 plus overpayment interest thereon as provided by law. This $658,332,365 was comprised of overpayments of $439,332,365 in tax and $219,000,000 of underpayment interest, all of which had been paid to the IRS.

57. By letter dated February 29, 2012, the IRS notified GE that it had disallowed in full GE's claim for refund for the 2000 tax year.

## COUNT ONE

### (Claim for Refund of Tax Overpayment for 2000 and Related Interest)

58. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 57, above, as if fully set forth herein.

59. GE's tax reporting of the 2002 internal restructuring complied with the requirements of the Internal Revenue Code, the regulations thereunder, and any applicable common law doctrines.

60. GE's tax reporting of the 2003 sale of ERC Life stock to Scottish Re complied with the requirements of the Internal Revenue Code, the regulations thereunder, and any applicable common law doctrines.

61. The IRS erroneously and illegally denied GE's claim for a refund of the overpayment of tax and interest for the 2000 tax year. The grounds upon which the IRS denied the claim are erroneous, unsupported by the facts, and contrary to applicable tax law.

62. ERC realized a capital loss in 2003 of $2,196,661,823 from the sale of 95 percent of its ERC Life stock. GE was entitled to carry the entire loss back to 2000 and is entitled to a refund for the 2000 tax year of assessed tax and interest paid to the IRS in the amount of $658,332,365, together with any overpayment interest accrued thereon. The correct amount of deficiency interest should be computed with interest netting as provided in IRC § 6621(d) and take into account the period from the payment by GE to the time of refund by the government.

63. In the alternative, to the extent the Court determines that GE is only entitled to any portion of the Disputed Capital Loss, GE is entitled to a corresponding refund of taxes and interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in its favor and against the Defendant United States as follows:

1. On the claims for relief in Count One of the Complaint, judgment in the amount of $658,332,365, or such other amount as is legally recoverable, plus overpayment interest thereon according to law; and

2. Plaintiff's costs of this action and such other and further relief as the Court deems appropriate.

Respectfully submitted this 14th day of February 2014.

        BINGHAM McCUTCHEN LLP

BY:  /s/ Michael C. D'Agostino
   Michael C. D'Agostino
   CT Bar No. CT17294
   Bingham McCutchen LLP
   One State Street
   Hartford, CT 06103
   Telephone: (860) 240-2731
   Fax: (860) 240-2800
   Email: michael.dagostino@bingham.com

   David J. Curtin, DC Bar No. 281220
   Rajiv Madan, DC Bar No. 463317
    *pro hac vice* forthcoming

   Bingham McCutchen LLP
   2020 K Street, NW
   Washington, DC 20006
   Telephone: (202) 373-6000
   Facsimile: (202) 373-6001
   Email: david.curtin@bingham.com
      raj.madan@bingham.com

   *Attorneys for Plaintiff*